UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 3:20-00161 |
| | ) | JUDGE TRAUGER |
| | ) | |
| WESLEY SOMERS | ) | |

### DEFENDANT WESLEY SOMERS' SENTENCING MEMORANDUM

Wesley Somers' upbringing was characterized by instability, poverty, early and extensive exposure to drug use, neglect, and abuse. His untreated ADHD, substance use during his developmental years and on the day of the offense, and the group mentality at work during the protests all likely affected his impulse control, judgment, and ability to regulate his impulses and behavior.

Mr. Somers, in accordance with probation's recommendation, respectfully requests a sentence of 60 months, the mandatory minimum sentence. Any higher sentence would be "greater than necessary" to satisfy the objectives of sentencing set forth in 18 U.S.C. § 3553(a).

A.  **Wesley's history and characteristics.**

Wesley Somers' formative years were wrought with adverse childhood experiences including emotional and physical abuse and neglect, homelessness, poverty, hunger, early exposure to substance abuse, and sexual abuse. These experiences lead to substantial involvement with the Department of Children's

1

Services ("DCS"), unaddressed trauma, and interactions with the criminal justice system, including his behavior at issue in this case.

Both of Wesley's parents were absent from his life, although in different ways. His father did not take part in raising him and Wesley said of his father, "he never wanted me." (PSR Appendix, Dr. Brown Expert Report, at p. 5.) His father suffered from alcoholism, panic disorder, exhibited obsessive and erratic behavior, and was often out "stealing and selling prescription drugs." (App. at p. 2, 5.)

His mother also had issues that left her incapacitated, neglectful of her children's emotional and physical needs, and vulnerable to unhealthy relationships. She suffered from drug addiction to opiates, crack cocaine—"everything," and Wesley was often exposed to drug use in the home. (PSR at ¶ 46, 48; App. at p. 2, 3, 5.) She had a "rotating door of men" in and out of the house. (PSR at ¶ 46.) One of those men would beat Wesley up; he also raped Wesley several times when he was twelve years old. (PSR at ¶ 47, 55; App. at p. 5, 7.) After examining Wesley, Dr. Brown notes in her expert report that he has largely not processed these traumas and that they continue to impair his functioning. For example, he has significant anxiety urinating in front of others; on one occasion he sat in the probation office for nine hours attempting to provide a drug test urine sample. (App. at p. 8, 13.) He still struggles to use the bathroom when his cell mate is present. (*Id.*)

As a child, Wesley's environment was one of chaos and uncertainty. He grew up in very difficult circumstances and was pushed to adapt to conditions of severe

neglect, poverty, and crime in ways not accepted by society. (*See* App. at p. 3.) His family relied on food stamps and lived in government subsidized housing. (PSR at ¶ 46.) They moved around a lot. As early as age six, Wesley experienced "housing hardship" (living in a place "not fit for human habitation"); he had also lived in a home without electricity and in drug-infested neighborhoods. (App. at p. 2.) Wesley was left alone for weeks without knowing where his mother was and often went hungry. (*Id.* at p. 2-3.) By around age 13 or 15, he and his mother were homeless. (PSR at ¶ 46; App. at p. 2.)

After approximately six months of homelessness, he was removed from his mother's custody by DCS. (PSR at ¶ 48; App. at p. 2.) At least three neglect reports had been made referring him to DCS; they noted a lack of supervision, environmental and nutritional neglect, and his mother's bipolar disorder and drug addiction. (App. at p. 2-3.) Even while in DCS custody, Wesley did not get to experience stability. He was passed between an astounding nine locations (at least) over the course of about a year and a half. (PSR at ¶ 48.)[1] Wesley's intake forms noted that his father was not an available resource, and that his maternal grandparents likely had substance abuse issues and had been incarcerated for seven years for armed robbery. (App. at p. 2-3.) His grandmother was not permitted to visit him during his time at Columbus House in 2010 due to her refusal to submit

---

[1] Dr. Brown's expert report goes into great detail regarding Wesley's experiences while in DSC and foster family custody, based on her review of DCS records. (App. at p. 2-4.)

3

to drug screens. (*Id.*) Often Wesley felt like no one wanted him, and records note that when he was told his aunt was invested in taking him in, his behavior improved. (*Id.* at 3-4.)

There is an extensive history of addiction on both sides of Wesley's family tree. (PSR at ¶ 44, 55.) His mother frequently used drugs in front of him, he lived in neighborhoods where drug use was prevalent, and he was forced to rely on selling drugs to get necessities. In addition to his parents' issues with drugs described earlier, his grandmother and grandfather still use heroin and methadone. (App. at p. 5.) Unsurprisingly, Wesley started using drugs at an early age and has suffered from serious drug and alcohol addiction for much of his short life. He started smoking marijuana at 12 (daily use), drinking alcohol at 12 (daily use), using Lortab, Opana, Xanax, Percocet, Valium, Roxicodone, Ocycotin, and Suboxone at age 13, ecstasy at 18, and methamphetamine and heroin at age 21 (daily use). (PSR at ¶ 56; App. at p. 8.) Wesley has engaged in self-harm behaviors like cutting himself and has had suicidal thoughts and attempts in the past by "doing more drugs than I could handle on purpose." (PSR at ¶ 55; App. at p. 7.) He had to be revived by Narcan on about four different occasions following drug overdoses. (PSR at ¶ 55; App. at p. 8.)

Growing up, Wesley also suffered from violent night terrors, panic attacks, and ADHD. (PSR at ¶ 53-55; App. at p. 7.) As Dr. Brown explains more fully in her report, Wesley's untreated ADHD, combined with drug use during his

4

developmental years and on the day of the offense at issue in this case, all likely affected his impulse control, judgment, and ability to regulate his impulses and behavior. (App. at p. 12-13.)

As a child and an adolescent, Wesley suffered from neglect, physical, emotional, and sexual abuse, and near constant instability. Both his parents were absent, in different ways. He did not have an adult to model proper behavior and response to stressors. His childhood trauma has yet to be addressed. Wesley realizes he has made mistakes but is remorseful and eager to change his life. He wants substance abuse treatment and also mental health therapy and cognitive behavioral therapy for his PTSD and past trauma.

### B. The nature of the offense.

Following the police murder of George Floyd, protestors gathered in large numbers in downtown Nashville on May 30, 2020. (PSR at ¶ 4.) During that protest, numerous individuals focused their attention on City Hall, using crowbars and various items to break windows, spray graffiti, and light fires. (*Id.* at ¶ 4-5.) Due to his "distinctive tattoos" Wesley was identified as one of the individuals involved, along with his co-defendant. (*Id.* at ¶ 5.) Video footage shows him breaking windows with a long object, placing a burning object into a window from outside the building, and spraying spray paint inside. (*Id.* at ¶ 5-6.) Other individuals also broke windows, sprayed graffiti, and lit fires that caused damage to City Hall. (PSR at ¶ 4-5.)

5

Wesley's actions were undoubtably serious, damaging, and dangerous. However, they should be viewed in the larger context of the feelings and energy motivating the protests, the large number of unascertained participants causing damage to the same City Hall building, and the group mentality at work during this event. As Dr. Brown states in her expert report, "individuals can behave in the context of a group in ways they would not when alone." (App. at p. 11.) She describes that while the original group was united for the greater good, some members directly participated in or encouraged negative behaviors (such as Wesley's.) (*Id.* at 12.) Individuals repeatedly yelled encouragement to Wesley, who was further fueled by cheers and applause from the large crowd. As Dr. Brown explains, "*groupshift*" occurs when the group position becomes "exaggerated towards more extreme positions." This scenario likely encouraged Wesley to make a risky decision, one he may not have made if evaluating it alone. (*Id.*) She describes "*deindividuation*"—which occurs when "individuals become lost in a group and lose their individual identity" and may go along with the group with a sense of anonymity. (*Id.*) While many participants did remain anonymous and have never been charged, Wesley was ascertained due to unique physical characteristics.

### C. Wesley's childhood supports a sentence of the mandatory minimum.

18 U.S.C. § 3553 requires a court to consider several factors in fashioning a defendant's sentence. The first factor, § 3553(a)(1), requires consideration of "the nature and circumstances of the offense and the history and characteristics of the

6

defendant." Wesley's traumatic upbringing is an important factor for this Court to consider in fashioning a sentence.

Courts have long recognized that a defendant's difficult childhood is a mitigating factor at sentencing. *See, e.g., California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring) (explaining that "evidence about the defendant's background and character is relevant [in death penalty case] because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse").

Wesley scores an eight on the ten-point Adverse Childhood Experiences Scale. (PSR at ¶ 5; App. at p. 13.) This score is obtained by *less than 1% of the general population*, showing just how uniquely difficult his childhood was. His exposure to this environment caused him to be constantly vigilant and "devote his resources to survival" while other skills were left significantly underdeveloped. (App. at p. 13.)

### 1. Abuse and neglect.

> Child abuse and neglect appear to influence the course of development by altering many elements of biological, cognitive, psychosocial, and behavioral development; in other words, child abuse and neglect "get under the skin" to have a profound and often lasting impact on development. Brain development is affected, as is the ability to make decisions as carefully as one's peers, or executive functioning; the ability to regulate physiology, behavior, and emotion is impaired; and the trajectory toward more problematic outcomes is impacted.

Institute of Medicine & National Research Council, *New Directions in Child Abuse and Neglect Research* 154 (Anne Peterson et al. eds., 2013), http://www.iom.edu/ Reports/2013/New-Directions-in-Child-Abuse-and-Neglect-Research.aspx. It is undisputed that child abuse and neglect have lasting effects. Chronic stressors such as poverty and neglect literally change the parts of a child's brain that are responsible for learning and processing of stress and emotion. *See* University of Wisconsin-Madison, *Early Life Stress Can Leave Lasting Impacts on the Brain*, ScienceDaily (June 27, 2014), http://www.sciencedaily.com/releases/2014/ 06/140627133107.htm.

Further, the fact that Wesley was moved around frequently, was sometimes homeless, and was passed between DCS homes had a serious effect on his development. (*See* PSR at ¶ 46, 48.) "Childhood residential mobility is associated with multiple long-term adverse outcomes (violent offending, attempted suicide, substance misuse, and unnatural death.) Although frequent residential mobility could be a marker for familial psychosocial difficulties, the elevated risks were observed across the socioeconomic spectrum, and mobility may be intrinsically harmful." Roger Webb et al., *Adverse Outcomes to Early Middle Age Linked with Childhood Residential Mobility*, 51 Am. J. Prev. Med. 291, 298 (2016), available at http://www.ajpmonline.org/article/S0749-3797(16)30118-0/pdf.

Wesley had an incredibly difficult upbringing. His father was absent, and his mother suffered from drug addiction and brought men into the home who put

8

Wesley at risk and caused serious harm. (PSR at ¶ 46; App. at p. 2-3, 5.) The family's poverty, constant movements, and instability led to his involvement with DCS, drug addiction, and the criminal justice system. (*Id.*) The neglect and abuse that Wesley suffered as a child had a significant effect on his development.

### 2. Child sexual abuse.

Childhood sexual abuse is uniquely destructive to long-term mental health outcomes. Jennie G. Noll, *Sexual Abuse of Children—Unique in its Effects on Development?*, 32 Child Abuse & Neglect 603, 603 (2008). Studies of the general population show increased risk of psychiatric illness associated with self-reported childhood sexual abuse. Elliot C. Nelson et. Al, *Association Between Self-Reported Childhood Sexual Abuse and Adverse Psychosocial Outcomes*, 59 Archives Gen. Psych. 139, 139 (2002). These illnesses manifest as anxiety disorders, depression, substance abuse, eating disorders, conduct disorders, borderline personality disorder, suicide attempt, revictimization, and relationship problems. *Id.* The link between childhood abuse and maldevelopment is "above dispute," and research suggests that neurological development is adversely impacted by childhood sexual abuse. Noll, *supra* at 604; *see also, generally*, Susan L. Andersen et al., *Preliminary Evidence for Sensitive Periods in the Effect of Childhood Sexual Abuse on Regional Brain Development*, 20 J. Neuropsychiatry & Clinical Neuroscience 292 (2008).

While female victims of sexual abuse tend to internalize the effects of abuse (e.g., depression and eating disorder), male victims of abuse tend to exhibit negative

externalized behavior, such as delinquency, violence, or alcohol abuse. Gail Hornor, *Child Sexual Abuse: Consequences and Implications*, 24 J. Pediatric Health Care 358, 359–60 (2010). Other examples of externalized coping among men sexually abused as children include aggression, antisocial behavior, and a lack of control over behavior. G. K. Dhaliwal et al., *Adult Male Survivors of Childhood Sexual Abuse: Prevalence, Sexual Abuse Characteristics, and Long-Term Effects*, 16 Clinical Psych. Rev. 619, 627 (1996). This response flows from male survivors' use of "palliative" coping skills, "in which any attempts to address problems are avoided." *Id.* Research has shown that groups of sexually abused men exhibit post-traumatic stress disorder at ten times the rate of control groups. Patrick J. O'Leary, *Men Who Were Sexually Abused in Childhood: Coping Strategies and Comparisons in Psychological Functioning*, 33 Child Abuse & Neglect 471, 478-79 (2009). Wesley's addiction, mental health struggles, and criminal behavior most likely stem at least in part from the unaddressed early childhood trauma that he experienced. (*See* PSR at ¶ 47, 55; App. at p. 5, 7-8, 13.)

### D. Wesley's addiction also justifies his requested sentence.

A person's environment, including "physical and sexual abuse, early exposure to drugs, stress, and parental guidance can greatly affect a person's likelihood of drug use and addiction." Sara Gordon, *The Use and Abuse of Mutual-Support Programs in Drug Courts*, Univ. of Illinois L. Rev., 1503, 1508 (2017). Like other diseases, alcoholism and drug abuse are influenced in large part by someone's

10

biology and tend to run in families. *Id.; see also* Peggy Fulton Hora and Theodore Stalcup, *Drug Treatment Courts in the Twenty-First Century: The Evolution of the Revolution in Problem-Solving Courts*, 42 Ga. L. Rev. 717, 730 (2008) (noting that genetics constitutes one of "three major risk factors that predispose an individual for the disease of addiction"). Addiction was prevalent in both sides of Wesley's family tree, and he was frequently exposed to his mother's and grandparent's drug use. (PSR at ¶ 44, 55-56; App. at p. 8.) His family history, exposure, and early use likely made him even more susceptible to suffering from addiction as well.

A primary symptom of addiction is "the user's inability, or refusal, to remain abstinent in the face of persistent outside pressure;" addiction works as "an independent force that overrides free will and volition." Timothy Edwards, *The Theory and Practice of Compulsory Drug Treatment in the Criminal Justice System: The Wisconsin Experiment*, 2000 Wis. L. Rev. 283, 328 (2000). The continued use of substances can actually "*physically alter the structure and functioning of the brain.*" Gordon, *supra*, at 1508 (emphasis added). Understanding this disease can "explain why an addict cannot simply stop using drugs by sheer force of will alone." *Id.* at 1512-13.

A defendant's addiction is a relevant factor at sentencing because a drug addict is both less culpable for his actions and more amenable to treatment and rehabilitation. *See, e.g.*, *United States v. Moore*, 2007 WL 1728667, at \*3 (E.D. Wis. June 13, 2007) (granting variance, in part, because defendant's prior convictions all

11

stemmed from his drug addiction and his criminal history score thus overstated the seriousness of his record); Patricia H. Brown, *Considering Post-Arrest Rehabilitation of Addicted Offenders Under the Federal Sentencing Guidelines*, 10 Yale L. & Pol'y Rev. 520, 523 n.22 (1992) ("The stronger the connection between the crime and the addiction, of course, the stronger the argument for consideration of rehabilitation from addiction as a relevant factor at sentencing.").

In short, when a defendant's instant offense (as well as his criminal history) springs from a longstanding pattern of addiction, the sentencing court must consider both how that addiction lessens the offender's culpability and what sentence will most effectively reduce the risk of her continued drug use and criminality. Here, it is clear from Wesley's criminal history that most of his convictions directly involved his addiction. He was "heavily" using alcohol and marijuana on the day of the protest as well. (App. at p. 13.) Wesley's addiction is not a moral failing, rather it is a chronic disease. This struggle supports his requested sentence.

### E. Wesley's mind was not fully formed at the time of his conduct in this case—or at the time of his prior misdemeanor conduct.

This offense occurred when Wesley was 25 years old. His misdemeanor criminal history which places him in criminal history category IV, occurred when he was 20-23 years old. (PSR at ¶ 28-34.) The federal government, brain researchers, and the United States Supreme Court, all recognize that the minds of adolescents and young adults are not fully formed. Youth are categorically less culpable than

12

adults, due to their lack of maturity and not-fully-developed sense of responsibility, which often lead to impetuous and ill-considered actions. *See Roper v. Simmons*, 543 U.S. 551, 569-70 (2005). Young people are more "inclined toward reward-seeking, more sensitive to social context, and more impulsive in their choices." Elizabeth Scott, Natasha Duell, and Laurence Steinberg, *Brain Development, Social Context and Justice Policy*, Washington U. J. of L. and Pol'y (forthcoming 2018). Thus, one should not conclude that a juvenile offender possesses an "irretrievably depraved character." *Roper*, 551 U.S. at 570. Instead, youth is a mitigating factor. *Id.*

Current research also reflects that the areas of the brain regulating judgment and self-control are not fully mature, even in young adults. BJ Casey, Richard J. Bonnie, et al., *How Should Justice Policy Treat Young Offenders?: A Knowledge Brief of the MacArthur Foundation Research Network on Law and Neuroscience* (2017). The *Brief* recognizes that "treating young adults like older prisoners does not reduce recidivism," and suggests the use of less harsh sanctions for less serious, non-violent offenses. *Id.* Further, many adolescents have their life trajectory "shaped by [their] interaction with the justice system." Scott, *supra*. For these individuals, "correctional facilities and programs constitute their social context and can have a critical impact on whether they successfully navigate the transition to productive adulthood." *Id.* Already more susceptible to peer pressure, youth are

13

often surrounded by "antisocial peers and adults" while in the correctional system. *Id.* Wesley's youth provides grounds for his requested sentence.

### F. This Court should impose a concurrent sentence with his pending related state cases.

Mr. Gordy is also charge in two state cases, Docket Nos. 2020-C-1863 and 2020-C-1453 with offenses related to his conduct at City Hall during the protest. Pursuant to *Setser v. United States*, 566 U.S. 231 (2012), this Court has discretion to impose the sentence to be served concurrently or consecutively to anticipated state sentences that has not yet been imposed. When exercising that discretion, 18 U.S.C. 3584(b) requires the court to consider the sentencing factors at 18 U.S.C. § 3553(a). In the present case, a sentence of 60 months' imprisonment, to be served concurrently with any term of imprisonment that he may receive on the pending state charges is sufficient, but not greater than necessary, to comply with the sentencing purposes. Due to the strong mitigating factors regarding Mr. Somers, such a sentence is sufficient to satisfy the statutory sentencing purposes.

In addition, U.S.S.G. § 5G1.3 mandates that if a "state term of imprisonment is anticipated to result from another offense that is relevant conduct to the instant offense … the sentence for the instant offense shall be imposed to run concurrently to the anticipated term of imprisonment." Mr. Somers is charged with disorderly conduct, aggravated arson, three counts of vandalism, and aggravated riot in the two cases pending in state court. (PSR at ¶¶ 38, 39.) These offenses are relevant conduct to the instant offense of conviction, pursuant to U.S.S.G. § 1B1.3. (*Id.*)

14

Thus, the guideline directs that the sentence in this case "shall be imposed to run concurrently" to the anticipated state sentences.

### G. The need for the sentence to promote the sentencing goals.

Given the powerful mitigating evidence present in this case, a sentence of 60 months is sufficient to promote the goals of sentencing. It is a long sentence for this young man who has experienced such a troubled childhood and youth. The severity of the mandatory minimum sentence will send a message that such conduct is not tolerated by society. Thus, it will reflect the seriousness of the offense, promote respect for the law, and provide more than a just punishment as required by 18 U.S.C § 3553(a)(2)(A). It will afford adequate deterrence and protect the public as directed by § 3553(a)(2)(B) and (C).

### H. A sentence longer than 60 months would produce unwarranted sentencing disparity.

On August 10, 2021, this Court sentenced co-defendant Shelby Ligons to a term of imprisonment of 12 months and one day. Ms. Ligons engaged in conduct similar to Wesley's conduct at the protest in 2020. As part of her case, the Court directed Ms. Ligons' counsel and the government to file supplemental pleadings regarding sentencing disparity. (Doc. No. 81.) A review of the pleadings filed by defense counsel and the government demonstrates that a sentence of 60 months is a longer sentence than many other individuals who have engaged in similar conduct have received. (Doc. Nos. 78, 82 and 83.) For example, Ryan Ray burglarized and set fire to two businesses in downtown Nashville during the protest on May 30. He was

15

sentenced in state court to ten years to be served on Community Corrections supervision with no term of imprisonment. (Doc. No. 78.) In addition, other individuals who engaged in similar or worse conduct than Wesley have received sentences of 60 months. For example, Garrett Patrick Ziegler received a 60-month sentence for using Molotov cocktails to firebomb the Dakota County Western Service Center in Minnesota as part of the George Floyd protests. (Doc. No. 82 at 4.) Ziegler also poured flammable materials in and around the building. (*Id.*) Thus, a sentence of 60 months is sufficient to support the sentencing goals and any higher sentence would produce unwarranted sentencing disparity.

I. Conclusion.

For all these reasons, Wesley Somers respectfully requests that this Court impose a sentence of 60 months.

Respectfully submitted,

*s/ R. David Baker*
R. DAVID BAKER
Assistant Federal Public Defender
810 Broadway Suite 200
Nashville, TN 37203
615-736-5047

Attorney for Wesley Somers

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of February, 2022, I electronically filed the foregoing *Defendant Wesley Somers' Sentencing Memorandum* with the clerk of the court by using the CM/ECF system, which will send a notice of Electronic Filing to the following: John Benjamin Schrader, Assistant United States Attorney, 110 9th Avenue South, Suite A961, Nashville, Tennessee 37203; Terra Everett, Senior U.S. Probation Officer, 110 Ninth Avenue S., Suite A725, Nashville, TN 37203.

*s/ R. David Baker*
R. DAVID BAKER
