```
 1                  IN THE UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF TENNESSEE
 2                         NASHVILLE DIVISION

 3
    UNITED STATES OF AMERICA        )
 4                                  )
                                    ) Case No.
 5         v.                       ) 3:20-cr-00161-1
                                    )
 6  WESLEY SOMERS                   )
                                    )
 7                                  )
    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
 8
                     TRANSCRIPT OF PROCEEDINGS
 9                       SENTENCING HEARING

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
11
    BEFORE:                  THE HONORABLE ALETA A. TRAUGER,
12                           DISTRICT JUDGE

13  DATE:                    MARCH 23, 2022

14  TIME:                    10:09 a.m.

15  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

16
    APPEARANCES:
17
    FOR THE GOVERNMENT:      MR. JOHN BENJAMIN SCHRADER
18                           U.S. Attorney's Office
                             Nashville, Tennessee
19
    FOR THE DEFENDANT:       MR. R. DAVID BAKER
20                           Federal Public Defender's Office
                             Nashville, Tennessee
21

22
    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
23  DEBORAH K. WATSON, RPR, CRR
    Official Court Reporter
24  837-A U.S. Courthouse
    Nashville, TN 37203
25  debbie_watson@tnmd.uscourts.gov
```

```
1                        *    *    *
2           The above-styled cause came on to be heard on
3    March 23, 2022, before the Honorable Aleta A. Trauger,
4    District Judge.  The following is a transcript of the
5    proceedings that were had, to-wit:

6
7           THE COURT:  Good morning.  We're here on
8    sentencing in *United States v. Wesley Somers*.  We have Ben
9    Schrader for the government and David Baker for Mr. Somers.
10          Mr. Somers, have you read the presentence report
11   and feel you understand it?
12          THE DEFENDANT:  Yes, Your Honor.
13          THE COURT:  There's one objection I need to rule
14   on.  I will hear any further argument, but I've read all your
15   materials on this objection.  Is there anything further from
16   the government?
17          MR. SCHRADER:  No, Your Honor.  I didn't file any
18   kind of response to that.  We agree with the conclusion that
19   probation has reached in terms of which enhancement will
20   apply there.  I think the language that's set forth and the
21   sentencing guidelines here is pretty straightforward.  I
22   think that Mr. Somers' conduct falls comfortably within the
23   language of that provision, and finding that that enhancement
24   applies here would be consistent with what the Court has done
25   with Mr. Somers' codefendant, Ms. Ligons, so we think that
```

1    the guidelines are properly calculated.

2              **THE COURT:**  Anything further from you, Mr. Baker?

3              **MR. BAKER:**  Yes, Your Honor.  Good morning, Your

4    Honor.

5              **THE COURT:**  Good morning.

6              **MR. BAKER:**  Your Honor, in the Ligons case, I

7    don't believe that the issue was litigated.

8              **THE COURT:**  It wasn't litigated.  It was raised.

9    It was commented upon that the plea agreement had

10   contemplated a different base offense level.

11             **MR. BAKER:**  Yes, I agree.

12             In the -- in this particular case, though, even

13   though the parties agree, I don't think that's binding on

14   Mr. Somers, and we don't think that it should apply for the

15   reasons stated in our memorandum.  This wasn't the attempted

16   destruction of that massive five- or six-story concrete and

17   marble beautiful structure, the historic courthouse in

18   downtown Nashville.  Most of the damage was water damage, the

19   impacted blinds, carpeting, walls, and office equipment.  My

20   understanding: that the damage was confined only to the first

21   floor of the courthouse and only caused a partial disruption

22   of the building.

23             So under the particular facts of this case, Your

24   Honor, we just respectfully submit that an offense level of

25   20 is more appropriate and that the -- Mr. Somers' activities

1  involved an endangerment to the building but not attempted

2  destruction.

3          THE COURT:  Yea.  I'm going to deny this

4  objection.  I have seen the various photos and videos, and I

5  believe that this conduct amounted to an attempted

6  destruction of a government building with burning objects

7  thrown into the building, windows broken, and then an

8  accelerant also sprayed.  And I don't think that Mr. Somers

9  was qualified to determine, oh, whatever I do is not going to

10  destroy this building because it's a stone building.

11          I don't think he was capable of making that

12  determination that it wasn't going to attempt to destroy the

13  building, and I think that the conduct amounted to attempted

14  destruction.  So that objection will be denied.

15          There's one typo that was called to my attention

16  that I'm going to ask probation to correct on page 22.  The

17  guideline custody provision should be 60 to 71, not 60 to 87.

18  So I'm just going to -- with that correction and with my

19  ruling, I'm going to accept the presentence report as my

20  findings of fact on all issues and on the application of the

21  guidelines.

22          The offense level is a 21.  The criminal history

23  category is IV.  The resulting guideline range would be 57 to

24  71 months, but the charge that Mr. Somers pled guilty to

25  carries a minimum mandatory sentence of 60 months.  So that

1  makes the guideline 60 to 71 months with one to three years

2  of supervised release.

3           There is no agreement in this case.  The

4  government is seeking a sentence at the top of the

5  guidelines, 71 months.  The defendant is seeking a sentence

6  at the bottom of the guidelines, 60 months.

7           Let me ask:  Do we anticipate that the state

8  authorities will be nolling the state charges as a result of

9  this sentencing or not?  What do we know about that?

10          **MR. SCHRADER:**  Your Honor, I have been in

11  communication with the state prosecutor handling those

12  charges.  I don't think they've made a decision yet about how

13  they want to proceed.

14          **THE COURT:**  Mr. Baker, do you know anything more?

15          **MR. BAKER:**  Your Honor, Mr. Somers and I have

16  obviously been very interested in that and have been pursuing

17  that with relish.  And at this point, the state is just

18  waiting to see what happens here and won't make any

19  commitments to me or Mr. Somers or to -- he has -- excuse me,

20  Your Honor -- a public defender in Metro, Mr. John Wiethe who

21  I have been coordinating with.  We just don't know yet.

22  We're hopeful that they will nolle the case.  We think that's

23  what should happen, but we don't know yet.  That will also

24  impact his pretrial jail credit.

25          **THE COURT:**  So it's -- yes, it will.  And so

1    they're going to decide, based on whether I give him 60

2    months or 71 months or something more, for Heaven's sake?

3            MR. BAKER:  I don't really understand the

4    reasoning of the state prosecutors at this point.

5            THE COURT:  Okay.  Thank you.

6            Are there any witnesses?

7            MR. BAKER:  Your Honor, I have Dr. Kimberly Brown

8    that I was going to call very briefly, not to just

9    regurgitate the report that I know that this Court has read

10   carefully, but just to highlight a couple of points, but also

11   to talk about an issue that is extremely concerning to

12   Mr. Somers; that is, his shy bladder syndrome.  We'd like to

13   address that and ask for some recommendations about that.

14           THE COURT:  Okay.  That's fine.  Dr. Brown.

15           MR. BAKER:  Your Honor, at this time we would call

16   Dr. Kimberly Brown.

17           (The witness was sworn.)

18           THE COURT:  Dr. Brown, you may remove your mask

19   while you're testifying.

20           THE WITNESS:  Thank you.

21   ///

22   ///

23   ///

24   ///

25   ///

| | |
|---|---|
| 1 | * * * |
| 2 | <u>**KIMBERLY P. BROWN, Ph.D.,**</u> |
| 3 | **was called as a witness, and after having been first duly** |
| 4 | **sworn, testified as follows:** |
| 5 | DIRECT EXAMINATION |
| 6 | **QUESTIONS BY MR. BAKER:** |
| 7 | Q.    Good morning, Dr. Brown.  Could you please -- |
| 8 | A.    Good morning. |
| 9 | Q.    -- just briefly describe your qualifications and your |
| 10 | position. |
| 11 | THE COURT:  I'm familiar with her qualifications. |
| 12 | You can dispense with that. |
| 13 | **BY THE COURT:** |
| 14 | Q.    And where are you employed, Dr. Brown? |
| 15 | A.    Vanderbilt University Medical Center. |
| 16 | Q.    Did you undertake a forensic psychological evaluation |
| 17 | involving Mr. Wesley Somers? |
| 18 | A.    I did. |
| 19 | Q.    And I'd like to ask you, first of all, you met with him |
| 20 | in person? |
| 21 | A.    No.  By videoconference. |
| 22 | Q.    That's right.  Okay. |
| 23 | And on the videoconference interview, did you discuss |
| 24 | with him his past? |
| 25 | A.    Yes.  We did that across two different dates. |

1  Q.    What have you learned about Mr. Somers' childhood and

2  some trauma that he may have experienced during his

3  childhood?

4  A.    And this comes from both his report, but also, I think

5  somewhat uniquely, from records that document the abuse and

6  neglect he experienced, by the Department of Children's

7  Services.

8        You know, briefly, he's had a horrible background.

9  He's had a lot of neglect, been transferred from different

10  caretakers, put in State's custody for dependency, neglect.

11  Never really had any stability.  Also was exposed to

12  significant abuse in addition to neglect.

13        You know, I think the way I'd categorize or

14  characterize his background is that he was exposed to a high

15  level of threat and harm with very little protection.  So

16  that combination of high threat harm and minimal protection

17  is really pretty dangerous to a -- the development of a

18  child.

19  Q.    Was his father present in his life?

20  A.    Barely.  No, his father was not a consistent figure.

21  He lived with his father very briefly.  It didn't work out.

22  So there hasn't really been any consistency or stability

23  there.

24  Q.    Did his father have issues with drugs and other

25  problems?

1    A.    Yes.  As has various family members from both sides,

2    really significant family history of addiction.

3    Q.    What about his mother?

4    A.    Mother as well.  Part of the reason his mother couldn't

5    take care of him or didn't take care of him well was because

6    of her own substance use issues as well as her mental health

7    issues.  You know, this led to periods of homelessness and

8    lack of food, nutrition, shelter, not to mention supervision

9    and caretaking.

10   Q.    Was Mr. Somers sexually abused when he was a child?

11   A.    That's what he reported to me, yes.  Multiple occasions

12   by two different perpetrators.

13   Q.    What type of testing did you do in your evaluation?

14   A.    I gave him a lingering screening instrument to consider

15   and rule out the possibility that he was feigning or

16   exaggerating symptoms.  That measure showed that he was not

17   exaggerating symptoms which was consistent with my impression

18   of him.  He seemed pretty forthcoming and straightforward.

19       I also administered two trauma-focused measures, and

20   these measures indicated quite a high degree of adversity in

21   his background; in particular, the ACEs, which most people

22   are familiar with, was a score of 8 which was just incredibly

23   high for the number of neglect and abuse factors he

24   experienced.

25   Q.    What were your diagnoses, Doctor?

A.    There were several.  He has significant substance use
issues.  So there are several substance use diagnoses.  He
has a history of ADHD dating back to a very young child, so
there's an ADHD diagnosis.  And also his trauma has resulted
in some significant psychological problems.  I'm not sure if
they're best characterized by PTSD.  I think more assessment
would need to be done to be sure that that's the diagnosis
versus more of a borderline personality disorder.  Both can
result from periods of trauma neglect like he has
experienced, and I think that the bottom line is that there
is a trauma disorder there, and it's either going to be PTSD
or borderline personality disorder.

Q.    What are your recommendations in terms of treatment for
Mr. Somers to help him overcome these issues going forward?

A.    You know, I think the big thing is that he needs some
type of trauma-focused treatment or program.  He -- he has
developed really great skills for survival because he had to,
but at the expense of a lot of other skills that we need to
function as fully independent adults.  And this includes
skills like being able to reflect on our decisions, being
able to anticipate the consequences of our actions, using
good judgment.

      You know, I think of Mr. Somers as sort of being driven
by instinct and impulse because that's what he needed to do
to survive.  I mean, literally, he didn't have food when he

1  was 14 and 15, and he had to figure out ways to eat.

2         But he doesn't have a lot of kind of high order

3  judgment, reflection, impulse, control planning.  So I

4  think -- and this is what treatment helps with.  A cognitive

5  behavior treatment program that really focuses on changing

6  his thinking patterns from a trauma-based lens, I think,

7  would be really helpful for him to develop those skills that

8  he needs for success, and also a substance addiction

9  treatment program as well.

10 Q.    So he needs a trauma-based mental health program as

11 well as substance abuse treatment?

12 A.    Yes.

13 Q.    Doctor, I want to ask you a bit about what some people

14 call shy bladder syndrome.  It's also known as paruresis.

15 Did you have a discussion with Mr. Somers about that?

16 A.    Yes.  He brought that up with me.

17 Q.    What did he tell you?

18 A.    He's very anxious about having to provide urine samples

19 for probation or for any kind of drug test.  He indicated

20 that this is a significant problem for him and has been; that

21 is, being able to urinate in public places or in front of

22 other people.  He indicated that it's not just limited to

23 situations where he has to give drug tests but that it

24 also -- he has difficulty urinating in front of a new

25 cellmate.  It causes him a tremendous amount of anxiety and

1   distress.

2       He is willing to do other things to comply with drug

3   testing such as hair samples or blood.  He just -- he has a

4   significant anxiety related to this issue of having to

5   provide urine where someone witnessed.

6   Q.    Can you, as a psychologist, diagnose whether or not he

7   has paruresis?

8   A.    It's not a psychological diagnosis although certainly

9   it has psychological underpinnings and has psychological

10  treatment.  I think first for him, it should be ruled out

11  that there's no medical causes of the paruresis, so maybe

12  seeing a urologist just to rule out any kind of medical

13  problems.  And then if it is truly due to likely his history

14  of sexual trauma by a male, and the anxiety that's resulted

15  from that, then that is treated with psychological treatment.

16  Q.    Is it true that people who have been sexually abused

17  can develop paruresis as a result?

18  A.    Yes.

19  Q.    And based on your -- your dealings with Mr. Somers and

20  your evaluation, do you think he's being serious that he has

21  this shy bladder syndrome?

22  A.    It sure does seem convincing.  He is very preoccupied

23  and anxious about it.  I know that he has brought it up with

24  you on many occasions.  He seems more concerned about this

25  issue than things like what sentence he could receive or what

1  is going to happen to him.  He's extremely anxious about

2  this.  So that attention that he focuses on this makes it

3  seem like this is a legitimate issue.

4          MR. BAKER:  Thank you, Doctor.  That's all my

5  questions at this time.

6          THE COURT:  Any cross?

7          MR. SCHRADER:  Yes, Your Honor.

8                    CROSS-EXAMINATION

9  QUESTIONS BY MR. SCHRADER:

10 Q.    Dr. Brown, good morning.

11 A.    Good morning.

12 Q.    I'm going to pick up on that line of questioning.  Are

13 you drawing a line between Mr. Somers' history of sexual

14 abuse and his condition, I think it's called paruresis?  Am I

15 understanding you correctly?

16 A.    I think that there could be a line there, yes.  I think

17 it's logical and consistent with what we know can happen in

18 victims of sexual abuse.  I think other causes need to be

19 ruled out as well.

20 Q.    Would it change your view at all if you knew that his

21 father had the same condition?

22 A.    There may be a genetic determinant to it.  I guess I

23 would need to know more about his father's condition and what

24 that might be due to.

25 Q.    You reviewed a number of materials in preparing the

1    report that was submitted to the Court.  You didn't review

2    any jail calls made by the defendant; is that correct?

3    A.    I was not presented with any jail calls, no.

4    Q.    And I want to make sure I --

5    A.    I'm sorry.  I was presented with one jail call.  I'm

6    sorry.  I was.  It was a very brief jail call, and David

7    Baker did present it to me, yes.  Sorry.

8    Q.    Okay.  I didn't see that in the report.  That's why I

9    asked.

10   A.    It was recently presented to me.

11   Q.    Okay.  Does -- so you're familiar with that jail call

12   then?

13   A.    Yes.  It was maybe about a minute or so.  It was very

14   brief.

15   Q.    Is there anything about the substance of that jail call

16   that has changed your view at all in terms of what's

17   reflected in your report?

18   A.    I did consider the jail call.  It seemed to me to be

19   another example of Mr. Somers kind of getting involved in

20   this group think where he does behaviors for the attention

21   and approval of others.  So I didn't think it was

22   inconsistent with the information that I had and the opinions

23   I reached.  Although I certainly would consider it if it

24   were.

25   Q.    And are you drawing a line between his childhood and

1  the conduct that he engaged in back on May 30th of 2020?

2  A.    I think there is a line there.

3  Q.    And so can you just kind of explain what the connection

4  is?  Is it direct causation?  Is it a contributing factor?

5  How do you view his childhood as sort of against the backdrop

6  of his conduct?

7  A.    Yeah, I think it's a contributing factor.  So I think

8  his childhood and his mental health issues make him more

9  vulnerable to the group pressures that I described in my

10  report.  So I think, you know, everyone can be affected by

11  group behavior.  But I think Mr. Somers is particularly

12  vulnerable and prone to this because of his ADHD, which, he

13  is impulsive, he is risk taking, he doesn't think through

14  decisions, he's caught up kind of by the excitement and

15  stimulus that's going on, as well as his childhood background

16  in which he doesn't have a good compass to guide him through

17  life.  He's just sort of driven by the emotions and

18  excitement that are happening at that moment.

19        And that's where I talked about, you know, his

20  development, his sacrifices.  It was focused literally on

21  survival.  And unfortunately, those other kind of higher

22  executive functioning that most of us can use to pause and

23  think and reflect on our behaviors and plan, he is not -- he

24  does not engage very well.  And so that's the link between

25  his childhood factors and his -- and the behavior at the time

1   of the crime.

2        Also, I will note that one of the things he told me in

3   describing what happened at the time of the charges was two

4   things:  One, when I asked him sort of why did you do this,

5   why did this happen, he kept telling me, "I wasn't thinking."

6   And to some extent, I believe that to be quite true.  He

7   really wasn't thinking.  He was just acting.

8        And the other thing he said is that during this

9   incident, he was particularly bothered or triggered by

10  seeing -- you know, amidst all the chaos, apparently there

11  was a police horse, and there was a young woman, a small

12  young woman who was somewhat trampled by the horse

13  accidentally.  And he was pretty upset and traumatized by

14  that, probably because of his history of trauma.  And he said

15  that at that point, it was like he just didn't care.  He just

16  sort of reacted going forward.

17       So that's another link I think between the childhood

18  history of trauma, what happened at the time, and his

19  actions.

20  Q.   Your conclusion is not, though, that his childhood

21  trauma inevitably led to this conduct?

22  A.   No, of course not.  I mean, these are all contributing

23  factors.  You know, Mr. Somers always has an element of

24  choice in all of his behaviors.  These are just things that

25  brought him to the table.

1  Q.   And there could be people in this world who would have

2  similar backgrounds to Mr. Somers who may have been present

3  on May 30th who wouldn't engage in the same sort of conduct

4  Mr. Somers did if they had made different choices.  Is that

5  fair to say?

6  A.   I don't know.  I mean, it's hard to say someone exactly

7  like Mr. Somers with his history of neglect and abuse and his

8  ADHD and impulsivity.  All I can say is that person is

9  particularly vulnerable to acting in reckless ways in this

10  situation.  I don't even know how I could even make a

11  decision about another person just like Mr. Somers.

12  Q.   And I'm not asking you to.  You're saying that it's

13  more likely that someone with his background would engage in

14  this conduct?

15  A.   Sure, yes.

16  Q.   But you acknowledge, I take it, that it's possible that

17  someone with his background or similar background could also

18  engage in different behavior?

19  A.   Yeah.  And I think that's the goal of treatment for

20  Mr. Somers, is that he can get to a point where despite his

21  background, that he can exercise better judgment and planning

22  so he doesn't make these choices again.

23  Q.   Dr. Brown, you had referenced in your report a progress

24  note related to when Mr. Somers came under the care of, I

25  believe, his maternal aunt.  And that note -- this is on

1  page 4 of your report -- says that Mr. Somers' behavior has

2  done a 180 for the better, not getting in trouble for anger

3  issues, only issue is some broken sleep.

4      Did you understand that to mean that at some point, his

5  behavior had not just improved, I guess, but done a 180?

6  A.   Yeah, absolutely.  It was really clear that once

7  Mr. Somers knew that there was somebody there for him, his

8  behavior improved dramatically.  And this is a consistent

9  theme throughout his life.  When somebody steps up and offers

10 to be there for him, he responds really well.  Unfortunately,

11 this relationship with his maternal aunt didn't last, but we

12 see other signs of this.

13     There is also an indication in an earlier case

14 management note that referred to him as an awesome kid, but

15 he has some issues.  And so I think this speaks to

16 Mr. Somers' potential to benefit from treatment.  He can

17 connect to people, he does benefit when someone steps into

18 his life and provides support, but he falls apart when that

19 structure and support isn't there.

20 Q.   And then, Dr. Brown, you touch on his diagnoses.  Do

21 you know whether he was ever prescribed with medication to

22 deal with any of those issues?

23 A.   Yes, he has been.

24 Q.   Did he take those medications?

25 A.   Yes.

```
1   Q.    Are you aware of any time when he stopped taking those
2   medications?
3   A.    He took them through most of his childhood.  He was
4   taking medication for ADHD for -- since the first or second
5   grade.  And then when he got into state's custody, he was
6   prescribed antidepressant medication to help with his anxiety
7   symptoms as well as hydroxyzine for anxiety.  And he has not
8   taken these medications, is my understanding, since
9   adulthood.  So no treatment in adulthood.
10  Q.    I take it you think that he would benefit potentially
11  from the administration of psychological medications or
12  psychiatric medications?
13  A.    Potentially.  But I think really the more indicated
14  treatment here is psychotherapy or, you know, a
15  counseling-based treatment program for his particular issues.
16  Q.    All right.  And then about the events of May 30th in
17  particular, you have reviewed the videos of Mr. Somers'
18  conduct?
19  A.    Yes, I did.
20  Q.    Early, some of the videos.
21        I take it you'd agree with me that he was one of the
22  instigators of that incident; is that fair to say?
23  A.    Sure, yeah.  I think he was definitely encouraged by
24  the people around him.  But yeah, he was one of the people
25  who actually did the acts.  He wasn't just talking about
```

1   them.

2   Q.   I take it you'd agree that his conduct may also have

3   encouraged others to engage in that sort of conduct?

4   A.   I don't know.  I'm not sure I can answer that.  What I

5   was noticing was how much his conduct was cheered on and

6   encouraged and reinforced by the crowd.  I didn't notice him

7   encouraging others.

8   Q.   They were responding in part to what actions that he

9   was engaging in?

10  A.   Sure.  It was a back and forth, yeah, a back-and-forth

11  cycle of reinforcement.

12  Q.   And there were many people in that crowd who seemed to

13  approve of that conduct?

14  A.   Apparently so, yes.

15  Q.   And you'd agree with me that in situations like that,

16  when sort of a mob or a large group of people get egged on

17  or, you know, are sort of driven to a frenzy, that can create

18  a dangerous situation?

19  A.   Yes, of course.

20          MR. SCHRADER:  Thank you, Your Honor.  No further

21  questions.

22          THE COURT:  Any redirect?

23          MR. BAKER:  Just a couple of questions, Your

24  Honor.

25  ///

1
                    **REDIRECT EXAMINATION**

2
**QUESTIONS BY MR. BAKER:**

3
Q.    Dr. Brown, the prosecutor asked you about a jail call.

4
I think you said you had heard that jail call at some point.

5
A.    Yes.

6
Q.    In that jail call, Mr. Somers is talking with a female,

7
and the female said:  "I said, are people treating you okay

8
in there?"

9
       And Mr. Somers responds:  "Yeah, I'm an effing celeb."

10
And then he goes on to talk about getting Pop-Tarts and

11
stuff.

12
       Did it seem to you from that call that he was letting

13
the young lady that he was talking with know that he was

14
okay, that he wasn't being attacked or hurt by anyone in the

15
jail?

16
A.    Yeah.  It was such a brief call, it was really hard for

17
me to make too much of it.  I don't know.  Yeah, I mean, she

18
did ask if he was okay, and I think he was trying to reassure

19
her.  I don't know who he was talking to.  Again, it was only

20
about a minute in length.  I didn't take too much from it.

21
Q.    I mean, the prosecutor describes it as gleeful, but

22
certainly that's a matter of interpretation.  Did it sound

23
gleeful to you?

24
A.    No, it didn't sound gleeful to me.  No.

25
         **MR. BAKER:**  Thank you.  That's all.

1          THE COURT:  Dr. Brown, the executive functioning

2    part of the brain typically does not mature until sort of mid

3    20s, correct?

4          THE WITNESS:  Correct.

5          THE COURT:  And early substance abuse retards that

6    even further, correct?

7          THE WITNESS:  Yes, Your Honor, as well as the

8    adversity and neglect.

9          THE COURT:  And so we've got really kind of a

10   triple whammy here.

11         THE WITNESS:  (Nodding head affirmatively.)

12         THE COURT:  Mr. Somers was 25 at the time of these

13   events, and so his executive functioning had not kicked in at

14   all.  And so we've got his chronological age, we've got the

15   executive functioning retarded by both the early drug use and

16   the trauma, and on top of all that is his unmedicated ADHD.

17         THE WITNESS:  Yes, that's correct.

18         THE COURT:  So that is, in my mind, a pretty big

19   factor accounting for his conduct.

20         THE WITNESS:  Yes, I agree.  I don't think he has

21   reached the potential that he has in life.

22         THE COURT:  Okay.  Thank you.  You may step down.

23         Any other witnesses?

24         MR. BAKER:  No, Your Honor.

25         THE COURT:  Okay.

1    **MR. BAKER:** I don't have any other witnesses, Your

2    Honor. I do have three letters that I think the Court has

3    already seen.

4         **THE COURT:** Yes, you sent those back to chambers

5    and I have read them.

6         **MR. BAKER:** Thank you, Your Honor. I'd like to

7    make those Defendant's Exhibit 1.

8         **THE COURT:** Okay. We'll make those exhibits to

9    the hearing, and I'm sure you've furnished them to

10   Mr. Schrader.

11        **MR. BAKER:** I have.

12        **THE COURT:** Yes, okay.

13        All right. Mr. Schrader, I'll -- yeah, if you

14   would give those to Ms. Beasley.

15        Mr. Schrader, I'll hear anything else you wish to

16   say about sentencing.

17        **MR. SCHRADER:** Thank you, Your Honor. First, just

18   on the ADHD point, this is one of the reasons I asked

19   Dr. Brown this question: I think this is a letter from

20   Mr. Somers' mother, Misty Somers. She notes partway down:

21   I'd like to note that I feel he should have never stopped

22   taking his ADHD medication which contributes to his being

23   very easily distracted and caught up in things.

24        I just don't know the answer to the question,

25   really, of to the extent to which he was prescribed

1 medication, took it, and potentially made a decision not to

2 take it any longer.  If he did, that was a decision that he

3 made.

4          I won't really say much more than I think what's

5 already in our filings, Your Honor.  The government obviously

6 views this as a very serious offense.  Here, Mr. Somers was

7 one of the instigators of this really unfortunate episode at

8 City Hall; one that got very dangerous, could have endangered

9 a lot of people, and caused significant damage to the

10 courthouse over there.

11          But Mr. Somers was leading the charge in some

12 ways, putting items in multiple different windows, using

13 accelerants to increase the size of the flames.  And then as

14 we noted in our papers, in the days following, he was

15 arrested essentially reveling in his fame.

16          The guidelines here are 60 to 71 months, and the

17 way the government views that is, that is what the Sentencing

18 Commission says an appropriate sentence ought to be.  It

19 ought to be somewhere in that range.  Obviously those are

20 advisory, and the Court can sentence anywhere in that range

21 or above that range, not below that range in this case

22 because of the mandatory minimum.

23          But this, from the government's perspective, is a

24 case that -- in the range that is more serious than others.

25 And that's the reason really that we've requested a sentence

at the top of the guidelines range.  If you look -- if you
think about the guidelines here as encompassing the crimes
that might be committed, you know, for which this guideline
calculation would result, this is among the more serious
offenses.

So for those reasons, Your Honor, for the --
because of the serious conduct in this case, and again,
because of the way that Mr. Somers seems to have found fame,
in a sense, in this conduct, and certainly not shown remorse
in the days following, we'd ask for a sentence at the top of
the guidelines.

**THE COURT:**  Thank you.

Mr. Baker?

**MR. BAKER:**  Your Honor, I want to comment first on
a couple of things that Mr. Somers has done.  Since he's been
incarcerated now for, I guess it's getting close to two
years, he has obtained his GED while in jail.  That's at
paragraph 58 of the presentence report -- excuse me,
paragraph 61.  And he's also completed the New Avenues drug
treatment program.  So Mr. Somers wants this Court to know
that he's attempted to use his time wisely to improve himself
while he's been incarcerated.

Your Honor, Mr. Somers is going to speak to the
Court in a moment, and Mr. Somers is remorseful.  There's no
question.

1          THE COURT:  Mr. Somers is what?

2          MR. BAKER:  Remorseful.  He is sorry for what he's

3  done.  He wishes he could go back in time and turn it back

4  and not have participated in this event.  Mr. Somers was --

5  went to the Black Lives Matter protest because he was in

6  favor of that cause, and he got himself way carried away,

7  impulsively engaged in this activity, and set -- appears to

8  me from the videos, two different objects were put in the

9  window, and then he sprayed spray-paint into the window.

10         Mr. Somers is sitting here not because he's the,

11  quote, instigator of all this.  There was a lot of people

12  involved in that, Your Honor.  We watched it live on

13  television.  He's sitting here because he was easily caught.

14  He was out there with his shirt off with these tattoos.  The

15  government can't catch the other people who did this.

16         Mr. Somers is sitting here taking all of the

17  blame.  His codefendant, Ms. Ligons, got 12 months and a day

18  because she cooperated.  There are many individuals who

19  weren't prosecuted at all.

20         Mr. Somers' childhood was horrific.  I mean, it's

21  just -- you know, Judge, I see a lot of folks that I

22  represent with bad childhoods, but this is a really bad one.

23  And it speaks to the resonance, I think, that he has within

24  him that he's doing as well as he is in his life at this

25  point:  Getting that GED --

1          (Reporter clarification.)

2          **MR. BAKER:** Completing the GED program and the New

3 Avenues program. And, I think, Your Honor, when you hear him

4 speak, you will be able to glean a little bit about what kind

5 of person Wesley Somers is. He's a really nice young man.

6          It's a serious crime. I love that traditional

7 courthouse downtown. I practiced law there for ten years

8 before I came to federal court. I was not at all -- I also

9 supported the cause as a person, but I was not happy with

10 what the protesters did. They should not have attacked the

11 courthouse or tried to set it on fire or smash windows.

12          And so Mr. Somers is going to have to pay a heavy

13 price now for his actions.

14          But, Your Honor, the Court's duty is sufficient

15 but not greater than necessary. 60 months is sufficient,

16 particularly when you look at what other individuals across

17 the country have received for similar activities, in the

18 excellent filings by both the government and Ms. Bell in the

19 Ligons case that set forth the other sentences that people

20 have received. So a sentence of 60 months would be on the

21 upper end of sentences, Your Honor, in this case.

22          Your Honor, Dr. Brown is correct -- excuse me,

23 Your Honor. Dr. Brown is correct that this young man needs

24 significant therapy for the horrible poverty, drug addiction

25 that he was exposed to, people coming into his house with his

1    mother, and the sexual abuse that he suffered.  These are

2    massive mitigating factors in this case, Your Honor.

3           But for the operation of the mandatory minimum, I

4    respectfully submit that 60 months is way more than

5    sufficient.  The guideline range is really 57 to 71.  The low

6    would be 57 but for the operation of the mandatory minimum.

7    So that's clearly enough, Your Honor.

8           Mr. Somers respectfully requests that the Court

9    recommend that he be incarcerated as close to Nashville as

10   possible.  He also wants the Court to recommend trauma-based

11   mental health treatment.  He asks the Court to recommend drug

12   treatment while he's in the Bureau of Prisons, and that the

13   Court order that he get further mental health treatment and

14   more drug treatment on his term of supervised release.

15          **THE COURT:**  I was struck that the probation office

16   did not recommend mental health treatment as a special

17   condition of supervised release.  Is there any explanation

18   for that, Ms. Everett?

19          **PROBATION OFFICER:**  No, Your Honor.  It may have

20   just been an oversight.  So I do think he would benefit from

21   a mental health treatment.

22          **MR. BAKER:**  Your Honor, Dr. Brown talked about the

23   fact that Mr. Somers is really worried about focused -- he

24   talked to me about it constantly -- this issue about drug

25   testing.  This is not him trying to avoid being drug-tested.

It's a real situation.  And so I'd ask the Court to recommend

that he be screened, medically screened, to see if he has

paruresis and that accommodations be made.  For a drug -- he

could be strip-searched, he's willing to undergo a strip

search and then go into a private room and pee -- excuse

me -- urinate for the drug test or a blood test.

So we ask that accommodations be made both while

he's in the Bureau of Prisons but also when he is on

supervised release so that he can provide a sample and be

drug-tested and not be accused of refusing to submit a drug

screen.  He's had that happen to him before, and he's gotten

in trouble, and he doesn't want it to happen again either in

the Bureau of Prisons or while he's on his supervised

release.

Your Honor, I have very high hopes for Mr. Wesley

Somers.  There's a lot of good in Wesley Somers.  I believe

that he's going to -- after he does his time, he's going to

get out of prison and he's going to stay out of trouble.  He

has three daughters that he loves.  And I have high hopes

that he can become a law-abiding citizen and not have any

further issues with the legal system.

**THE COURT:**  Thank you, Mr. Baker.

Mr. Somers, you have the opportunity to address

the Court, tell me anything you want me to hear before I

decide on your sentence.

1          **THE DEFENDANT:**  Yes.  I would just like to say

2     that I am very sorry for my actions and I am very remorseful.

3     But I can't, you know, focus on the past.  I've just got to

4     focus on what I'm going to do in my future and that's, you

5     know, I want to go and get some certificates maybe in the

6     HVAC field or electric field when I get out and just better

7     my life and, you know, just be a productive member of

8     society, and that's it.

9          And for sure, I want to be there for my daughters

10    when I get out.  I -- my youngest in particular, you know,

11    because she was only 4 months old when I got incarcerated,

12    and I -- you know, she don't even know who I am, so that

13    affects me, but . . .

14          **THE COURT:**  You still have a relationship with her

15    mother?

16          **THE DEFENDANT:**  On the phone.  I talk to her on

17    the phone.  And I -- her mother is not doing very well.

18    She's struggling with certain things, but, you know, I talk

19    to her mother, my -- the mother to my child, I talk to her

20    mother very regularly because she watches my daughter and she

21    actually sets up video calls and stuff like that so I can see

22    her and stuff.  So she knows who I am somewhat but not

23    like -- you know, it's different with somebody that young,

24    you know, over the video screen.  They just think it's for

25    fun, you know.

1              **THE COURT:** Yeah.

2              **THE DEFENDANT:** That's it.

3              **THE COURT:** Okay. Thank you.

4         All right. The Court's obligation is to impose a

5    sentence sufficient but not greater than necessary to comply

6    with the purposes of the sentencing statute, taking into

7    account the nature and circumstances of the offense and the

8    history and characteristics of the defendant.

9         Mr. Somers has pled guilty to malicious

10   destruction of property with fire and explosives on May 30 of

11   2020. This was a demonstration in connection with the George

12   Floyd situation that got out of control. Mr. Somers

13   participated in the breaking of windows and setting of fires

14   and using accelerants to make those fires greater at the

15   Historic Metro Courthouse where I also practiced for many

16   years and actually served in the Mayor's office at some point

17   for a year. So it's a beautiful building. Luckily, even

18   though over $600,000 of damage was done to that building, it

19   has recovered.

20        But this was a very, very serious crime, and I

21   guess Congress has determined that, by having a minimum

22   mandatory of five years if you violate this statute. So

23   there's no question about the seriousness of the crime.

24        In terms of Mr. Somers' background, his criminal

25   history puts him in Criminal History Category IV. He has

1    lots of misdemeanor violations, and I was always concerned to

2    see domestic violence in his past, and he has several

3    incidents of domestic violence with his early girlfriend with

4    whom he has two children.

5              In terms of his personal background, it is one of

6    the sadder ones I have seen.  He is presently 27.  He -- his

7    parents were married, but they separated when he was young.

8    He's got several siblings and half siblings, but his -- both

9    sides of his family have serious addiction issues.  After the

10   father left the home, Mr. Somers' mother had serious

11   addiction issues, had men in and out of the home.  They were

12   homeless at periods of time.  Mr. Somers didn't have enough

13   to eat at periods of time.  He was physically and sexually

14   abused by the boyfriends that his mother brought in.  She may

15   actually have been prostituting herself during part of his

16   upbringing.

17             He did have some time with his grandparents, and

18   he apparently described that as very good at -- to the

19   probation officer.  But, in fact, from the other materials

20   furnished in the sentencing process, the grandparents also

21   had addiction issues, had gone to jail for armed robbery.

22   Mr. Somers' sad childhood experiences landed him in DCS

23   custody where he had numerous placements, ran away, had

24   suicide attempts.

25             He has ADHD which was medicated while he was a

1   child, and then it looks as though he turned to

2   self-medication.  His history of drug abuse started very

3   young with many drugs: alcohol and marijuana at a very young

4   age, turning to pills at 13, meth at 21, heroin; very bad

5   addiction issues.

6           He dropped out of school in the tenth grade, ran

7   away with his girlfriend who probably was pregnant at that

8   time, and she's had two children by him.

9           He has serious mental health issues.  He has a

10  score of 8 on the adverse childhood experiences scale which

11  is very serious.  He has untreated trauma, untreated ADHD,

12  probably has PTSD as well.  And as I discussed with

13  Dr. Brown, his age and lack of maturity are large factors, in

14  the Court's mind.  They don't excuse his behavior, but they

15  explain it to a large degree.

16          His executive functioning is still not there,

17  probably won't be there for several more years, and certainly

18  wasn't there two years ago.  He was using drugs; his

19  executive functioning was retarded because of his early drug

20  use.  His ADHD contributed to his impulsive behavior, and I

21  found Dr. Brown's explanation of the kind of group dynamic

22  that gets going and got going that night in Nashville

23  unfortunately with people egging each other on to do terrible

24  things and do damage instead of peacefully protesting

25  something that had a legitimate cause.

1          So for all these reasons, my sentence is going to

2   be 60 months in the custody of the Bureau of Prisons.  That

3   will run concurrently with any state time to be imposed.

4   That will be followed by three years of supervised release.

5          I don't levy a fine because I find he's

6   financially unable to pay a fine.  He must pay the $100

7   special assessment.  No party has sought restitution although

8   they could have.

9          The special conditions of his supervised release

10  are drug testing and substance abuse treatment.

11         And I want to add to this paragraph, Ms. Everett,

12  that a special accommodation will be considered for

13  Mr. Somers' shy bladder syndrome issues.  I want that added

14  to that condition.

15         He must not use or possess controlled substances

16  without a valid prescription and furnish to the probation

17  office information about any physician that prescribes

18  controlled substances.

19         We will add the standard condition for mental

20  health treatment, and I would like that to have a specific

21  reference to trauma-based mental health treatment.  And I

22  will ask Ms. Everett to furnish that language to Ms. Beasley

23  for inclusion in the PSR, and furnish all financial records

24  and tax returns.

25         I'm going to recommend substance abuse treatment,

1    mental health treatment, specifically trauma-based mental

2    health treatment.  Recommend placement close to Nashville.

3    I'm going to recommend vocational training; substance abuse

4    treatment, if I didn't say that; and I'm going to

5    specifically recommend that he have a medical evaluation to

6    determine if there is a medical reason for his paruresis,

7    have that evaluation in the Bureau of Prisons.

8            Another mitigating factor here is Mr. Somers'

9    post-offense rehabilitation.  I think it is a very big deal

10   that Mr. Somers has gotten his GED housed in a county

11   facility.  There's not a lot of programming in these county

12   facilities, and the fact that Mr. Somers has taken advantage

13   of what he could is a very good indication, I think, of

14   remorse and post-offense rehabilitation.

15           He's gotten his GED, he has completed a drug

16   treatment program, and he apparently is doing a lot of

17   reading and a lot of studying.  And religion has either come

18   into his life or back into his life, and that is apparently

19   giving him some solace and some strength.

20           I believe that this sentence will reflect the

21   seriousness of the offense; promote respect for the law; be a

22   just punishment; protect the public from further crimes by

23   the defendant; provide him with needed vocational training,

24   substance abuse treatment, mental health treatment; and it

25   will not create unwarranted sentencing disparities because it

1   is a guideline sentence.

2           Mr. Somers, you may appeal your sentence.  Any

3   appeal must be filed within 14 days.  You may apply to appeal

4   under the pauper's oath, and the clerk will file your

5   Notice of Appeal if you request the clerk to do so.

6           Does the government have any objections not

7   previously raised?

8           **MR. SCHRADER:**  No, Your Honor.

9           **THE COURT:**  Any objections by the defense not

10  previously raised?

11          **MR. BAKER:**  No, Your Honor.  Thank you.

12          **THE COURT:**  Mr. Somers, I have a lot of hope for

13  you.  I agree with Mr. Baker that you sound to me like a very

14  intelligent individual.  You just had a lot of circumstances

15  in your background that affected you.  I hope you can get

16  some treatment while you're in the BOP.

17          I know that when you get on supervised release,

18  you can get treatment under our supervision and the

19  supervision of the probation office, but I hope that can all

20  start at the Bureau of Prisons.  And I hope you can stay in

21  touch with your family members, and I wish you good luck.

22          **THE DEFENDANT:**  Thank you, Your Honor.

23          **THE COURT:**  We're in recess.

24          (WHEREUPON, the foregoing proceedings were

25  concluded at 11:03 a.m.)

1   REPORTER'S CERTIFICATE

2

3          I, Deborah K. Watson, Official Court Reporter for

4   the United States District Court for the Middle District of

5   Tennessee, with offices at Nashville, do hereby certify:

6          That I reported on the Stenograph machine the

7   proceedings held in open court on March 23, 2022, in the

8   matter of *UNITED STATES OF AMERICA vs. WESLEY SOMERS*, Case

9   No. 3:20-cr-00161-1;

10         That a transcript of proceedings in connection

11  with the hearing was reduced to typewritten form by me;

12         That the foregoing transcript (pages 1 through 36)

13  is a true and accurate record of the proceedings to the best

14  of my skills and abilities;

15         This the 7th day of April, 2022.

16

17                                    /s/ Deborah K. Watson
                                      _____
                                      DEBORAH K. WATSON, RPR, CRR
18                                    Official Court Reporter

19

20

21

22

23

24

25